IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MAELANI LARIN FOWLER,

          Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.

CASE NO. 5:22-cv-1114

DISTRICT JUDGE
SOLOMON OLIVER, JR

MAGISTRATE JUDGE
JAMES E. GRIMES JR.

**REPORT &
RECOMMENDATION**

Plaintiff Maelani Larin Fowler filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2020, Fowler protectively filed an application for Supplemental Security Income alleging a disability onset date of June 1, 2020,[1] and claiming she was disabled due to autism and Asperger syndrome. Tr. 19, 165, 186. The

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Social Security Administration denied Fowler's application and her motion for reconsideration. Tr. 81, 88. Fowler then requested a hearing before an Administrative Law Judge (ALJ). Tr. 111.

In May 2021, an ALJ held a hearing. Tr. 50–80. Later that month, the ALJ issued a written decision finding that Fowler was not disabled. Tr. 16–45. The ALJ's decision became final on April 27, 2022, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

In her Complaint filed in June 2022, Fowler asserts the following assignments of error:

> 1.  The ALJ erred when he failed to find that the opinions of the treating and reviewing physicians were consistent with and supported by the medical evidence and failed to incorporate the stated limitations into the RFC.
>
> 2.  The ALJ erred when he failed to follow Social Security Ruling 11-2p and find that Fowler's impairment related symptoms would preclude her from engaging in substantial gainful activity on a full-time and sustained basis.

Doc. 7, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Fowler was born in 2001 and was 18 years old on the date she filed her application.[2] Tr. 43.

---

[2]    The earliest that Supplemental Security Income is payable is the month after the month the claimant filed an application. *See* 20 C.F.R. § 416.335.

2.    *School and vocational records*

In August 2017, the Ohio Bureau of Vocational Rehabilitation determined that Fowler was significantly disabled and had limitations in self-direction and interpersonal skills.[3] Tr. 246. A Comprehensive Assessment Form was completed the next month. Tr. 249–53. That form noted that Fowler attended school year-round and received special education services due to autism. Tr. 249. At that time, Fowler was in tenth grade and requested help finding work. Tr. 249, 254, 273. Fowler's case was closed in December 2018 because neither Fowler nor her mother responded to the agency's communications. Tr. 285–287.

In February 2019, when Fowler was in eleventh grade, her school completed an Evaluation Team Report. Tr. 403–24. Fowler's then-current letter grade in English was "C+" at 78%. Tr. 408. Fowler had no math grade because the "[q]uarter just began" and "due to absences and snow days[.]" Tr. 410. Her full-scale IQ score was 114. Tr. 414. The evaluator concluded that Fowler's special educational services would continue. Tr. 423.

In February 2020, Fowler's school completed Fowler's Individualized Education Plan. Tr. 375–93. The plan noted that Fowler received her instruction in general education classes with allowable accommodations. Tr.

---

[3]     The records were generated by the Opportunities for Ohioans with Disabilities. The ALJ referred to this evidence as the "Ohio Bureau of Vocational Rehabilitation records." Tr. 27. For clarity, I use the same term that the ALJ did.

377. Fowler also received support in setting goals, organizational strategies, and interpersonal relationships. Tr. 377. Her teachers were concerned about her frequent class absences. Tr. 378. One teacher described Fowler as doing "okay" in class and another teacher said that Fowler was doing "very well" in class. Tr. 378.

### 3. *Medical evidence*[4]

*Evidence before Fowler's application date.* Fowler received counseling at Phoenix Rising. Tr. 527. In October 2017, Fowler was assessed with a Global Assessment of Functioning score of 68.[5] Tr. 530.

In May 2019, when Fowler was 17 years old, she saw Kelly Gaughen, D.O., for a well child visit. Tr. 315. Fowler said that she was "doing pretty well"

---

[4]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[5]     Global Assessment of Functioning (GAF) considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* In 2013, the Fifth Edition of the Diagnostic & Statistical Manual of Mental Health Disorders was published and did not include the GAF. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013, at 16.

in school. Tr. 315. Fowler's exam findings were normal. Tr. 316. Dr. Gaughen assessed Fowler with childhood obesity and Asperger's Disorder. Tr. 316.

In August 2019, Fowler went to the emergency room for ear pain and denied any other kind of pain. Tr. 308, 365. In October, Fowler went to the emergency room for an allergy flare-up and denied pain, including back pain. Tr. 294–95. In November, Fowler went to the emergency room for viral gastroenteritis and had "no other complaints." Tr. 293. A few days later, Fowler followed up at her pediatrician's office for her gastroenteritis and didn't report other medical issues. Tr. 323.

Also in October and November 2019, Fowler's counselor at Phoenix Rising described Fowler as having a euthymic[6] affect and expression. Tr. 505, 510.

In December 2019, Fowler went to the emergency room for a closed head injury. Tr. 333, 336. She did not complain of back pain or other chronic pain. Tr. 333–36. Fowler's exam findings were normal—good eye contact, normal affect, full arm and leg strength, and normal speech. Tr. 334.

Fowler regularly attended individual counseling sessions at Phoenix Rising. Fowler's diagnoses were listed as major depressive disorder, single episode, unspecified; pervasive developmental disorder, unspecified; and attention-deficit hyper-activity disorder (ADHD), unspecified. *E.g.*, Tr. 454. In

---

[6]    A euthymic affect is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary, at 655 (32d ed. 2012).

January 2020, Fowler told her licensed mental health counselor, Rachel Pearson, that her mother kicked her out of the house and she was living with her father. Tr. 500. Fowler said that she was attending school every day and her grades had improved since she moved to her father's house. Tr. 500. She also reported fewer depressive symptoms and more instances of self-care and social interactions. Tr. 501.

In early March 2020, Fowler saw Pearson and had a euthymic affect and expression. Tr. 490. Fowler's grades continued to improve and Fowler was on schedule to graduate from high school. Tr. 490. Fowler described improved motivation and a "'happy mindset'" since moving in with her father. Tr. 490. Later that month, Fowler's sessions became telephonic due to Covid-19 restrictions. Tr. 468. Fowler said that she was completing her online schoolwork with no problem. Tr. 485. She experienced some stress due to verbal arguments with her uncle. Tr. 485.

In May 2020, Fowler told Pearson that she completed school and would receive a diploma. Tr. 468. In June, Fowler told Pearson that her mood continued to improve. Tr. 459. Later that month, Fowler saw Pearson for a session and reported increased stress from her uncle's mental health symptoms, including that he frequently began arguments. Tr. 449. Pearson described Fowler as having a "slightly anxious affect and expression evidenced through intermittent eye contact, tapping of legs/feet, [and] frequent re-posturing." Tr. 449.

6

*Evidence dated after Fowler's application date.* In July 2020, Fowler saw Pearson and exhibited the same slightly anxious behavior as her prior visit. Tr. 444. Fowler said that she moved back in with her mother due to stress caused by her uncle. Tr. 444. In August, Fowler said that she split her time between her parents. Tr. 435. Pearson wrote that Fowler had backed off her goals towards independence, including exploring employment, and Fowler often responded that she wasn't worried about things because her mother would take care of them. Tr. 435. Fowler "d[id]n't do much now, just art." Tr. 435-36. Pearson wrote that Fowler had made minimal progress. Tr. 432.

In late August 2020, a podiatrist diagnosed Fowler with Achilles tendonitis and ordered physical therapy. Tr. 662. Fowler had a physical therapy evaluation and said that a few months before the appointment, she was doing a lot of gardening on her grandmother's farm. Tr. 606. A week later, Fowler said that she felt good after her last therapy appointment "until she had to carry a heavy air conditioner up the steps" and her pain returned. Tr. 637.

In early September 2020, Fowler saw Pearson for a counseling session. Tr. 562. Fowler had a euthymic affect and expression and said that she was "not depressed like [she] used to be." Tr. 562. She was actively engaged in her session with Pearson. Tr. 562. Fowler discussed increased communication with her partner and indicated that she was applying for work at the retail store Gabriel Brothers. Tr. 562.

7

Later that month, Fowler saw primary care doctor Joseph Sebastian, M.D., to establish care. Tr. 568. Fowler said that she "ha[d]scoliosis" and back pain and wanted a physical therapy referral. Tr. 568. "Overall she states she is doing well." Tr. 568. Fowler denied joint and muscle pain and headaches. Tr. 568. Dr. Sebastian's exam findings showed that Fowler had macromastia (overly large breasts), obesity, and Fowler's back showed a "kyphotic stature without gross deformities or deviation laterally of spine—limited by [body] habitus." Tr. 569. Fowler's thought processes and cognitive function were pressured and Fowler appeared emotionally labile. Tr. 569. Dr. Sebastian diagnosed Fowler with chronic mid-back pain, polycystic ovarian disease, Asperger's disorder, and macromastia. Tr. 569. Dr. Sebastian wrote that overall, Fowler was doing well. Tr. 569. He stressed the importance of diet and exercise given Fowler's weight, and, "as requested, provided referrals to a surgeon for breast reduction and physical therapy for back pain." Tr. 569.

In early October 2020, Fowler had a telephonic counseling session and told Pearson that her physical therapist told Fowler that Fowler couldn't work for at least a year or else she would permanently damage her Achilles tendon. Tr. 558. Fowler said that she took medical transportation on her own and that, when she worked, she could interact socially with her peers with minimal anxiety. Tr. 558. Two days later, Fowler told her physical therapist that she quit her job due to Achilles tendon pain, but her employer called Fowler to offer her a stool to use while working. Tr. 620.

8

Later in October 2020, Fowler's mother told Pearson that Fowler was working and attending physical therapy. Tr. 552. Fowler was doing well at work. Tr. 552. In late October, Fowler was discharged from physical therapy and reported "significant improvement." Tr. 648. She rated her heel pain a one on a scale of ten. Tr. 644.

Meanwhile, Fowler started physical therapy for back pain. *E.g.*, Tr. 758. In late October 2020, Fowler rated her back pain a three on a scale of ten. Tr. 758.

In early November 2020, Fowler told the physical therapist that her back pain increased to a five on a scale of ten after she worked eight hours—double her usual shift. Tr. 754. The next day, Fowler saw Pearson and had a euthymic affect and expression. Tr. 548. Fowler said that she had surgery to remove an ingrown toenail and an upcoming follow-up appointment, and that her employer accommodated her physical health needs. Tr. 548.

In December 2020, Fowler told her case manager at Phoenix Rising, Kayla Lee, that she left her job because she had to quarantine after her mother tested positive for Covid. Tr. 890. Fowler said that she wanted to work but first needed to get her medical appointments "under control." Tr. 890. In the interim, Fowler was seeking Social Security disability. Tr. 890. She planned to live with her boyfriend once they found a place, but she was bothered that her boyfriend was procrastinating in finding a job. Tr. 890.

9

Also in December 2020, Fowler told her physical therapist that she had to quit her job because of lower and mid-back pain. Tr. 582. Fowler wasn't taking pain medication and didn't want to. Tr. 582.

In January 2021, Fowler saw Pearson and had a euthymic affect and expression. Tr. 885. Fowler reported that since she completed physical therapy, she "fe[lt] a lot better moving and walking." Tr. 885. She was more comfortable in social settings, but her current living situation affected her depressive symptoms. Tr. 885. Three weeks later, Fowler told Pearson that she used her savings from her job to buy a virtual reality headset for recreation. Tr. 879. Pearson wrote that Fowler had made good progress. Tr. 876.

In February 2021, Fowler was discharged from physical therapy and was to continue her home exercise program and aquatic exercises at the YMCA. Tr. 822.

During a home visit in March 2021, Fowler told Lee that it was hard to get out of bed due to physical pain. Tr. 857. Her father "made her start driving and working towards getting her license." Tr. 857. Later that month, Fowler saw Pearson. Tr. 854. Fowler had a euthymic mood and expression. Tr. 854. She said that she felt more depressed and had no one to talk to. Tr. 854. She reported low motivation, a loss of interest in activities, and a sad mood. Tr. 854. It was hard to get out of bed. Tr. 854. Pearson stated that she "engaged [Fowler] to completing the evaluation sheet requested by her attorney." Tr.

854. In connection with the form, Fowler indicated that she didn't "get" long tasks but could perform tasks one at a time. Tr. 854.

The same day, Pearson completed a Mental Impairment Questionnaire on Fowler's behalf. Tr. 564–65. Pearson wrote that Fowler was diagnosed with major depressive disorder, single episode, unspecified; pervasive developmental disorder, unspecified; and ADHD, unspecified. Tr. 564. When asked for the list of prescribed medications, Person wrote, "N/A." Tr. 564. Pearson wrote that the clinical findings that demonstrated the severity of Fowler's symptoms were based on "collaboration with [Fowler]" and Pearson's observations in counseling sessions. Tr. 564. Several of the sections asking for Fowler's functional imitation, like social interaction and adaption, were crossed out. Tr. 564–65. The boxes that were checked indicated that Fowler could maintain regular attendance and be punctual. Tr. 564. Fowler could understand and remember very short and simple instructions. Tr. 565. She could satisfactorily carry out very short and simple instructions; understand, remember, and carry out detailed instructions; remember locations and work-like procedures; and set realistic goals or make independent plans. Tr. 564–65. She was seriously limited, but not precluded, in her ability to perform activities within a schedule, sustain an ordinary routine without special supervision, and compete a normal workday and workweek without interruption from psychological symptoms. Tr. 564. Fowler was "unable to meet competitive standards" in maintaining attention and concentration for extended periods.

11

Tr. 564. Pearson wrote that she was "unable to determine" how often Fowler would be absent from work or off-task when performing job duties. Tr. 565.

    *4.*    *Function report*

In February 2021, Fowler's mother completed a Third-Party Function Report. Tr. 229–43. Fowler's mother wrote that Fowler didn't like to talk to people and didn't understand needed communication skills. Tr. 229. She was apprehensive in unknown circumstances. Tr. 229. Fowler prepared simple meals, cooked on the stove, did her own laundry, and washed dishes. Tr. 233. She cared for her pets—two birds and two gerbils—and Fowler's mother sometimes helped remind Fowler to clean their cages. Tr. 231. Fowler shopped online and was good with money. Tr. 235. She needed to be told to shower and brush her hair and didn't understand "the seriousness of hygiene." Tr. 231. Fowler's mother had to arrange rides for Fowler and accompanied Fowler to all of her appointments, except counseling. Tr. 237.

Fowler's mother wrote that Fowler had problems with comprehension and tasks. Tr. 239. Fowler did "ok" following written instructions but "can still get off task." Tr. 239. She needed constant reminders and encouragement with verbal instructions. Tr. 239. Fowler spent most of her time on her computer, virtual gaming or "video chatting" with her boyfriend. Tr. 231. On rare occasions, Fowler and her boyfriend went for a walk. Tr. 235.

5.    *State agency opinions*[7]

In September 2020, Joan Williams, Ph.D., reviewed Fowler's record and assessed Fowler's mental residual functional capacity (RFC).[8] Dr. Williams found that Fowler retained the ability to concentrate to perform one- to four-step tasks. Tr. 86. She could occasionally interact on a brief and superficial basis with coworkers, supervisors, and the general public. Tr. 86. Fowler could adjust to common workplace changes, including schedule changes and the introduction of new tasks. Tr. 86. She could not adjust to work settings that imposed daily, unpredictable tasks and novel, problem-solving demands. Tr. 86.

In January 2021, Carl Tishler, Ph.D., reviewed Fowler's record and agreed with Dr. Williams's findings. Tr. 92–91.

---

[7]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[8]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

6.    *Hearing testimony*

Fowler, who was represented by counsel, testified at the telephonic administrative hearing. Fowler stated that she lives with her mother. Tr. 60. Fowler doesn't have a driver's license. Tr. 60. If she needs to go somewhere, she takes transportation supplied by her medical insurance. Tr. 60.

In 2020, Fowler worked for a month or two as a part-time cashier at Gabriel Brothers. Tr. 61. She stopped working because she didn't feel reliable. Tr. 61–62. "[She] just kept not coming in." Tr. 62. She doesn't remember why. Tr. 62. When asked why she can't work, Fowler said that "[a] lot of people make [her] … anxious when [she's] around them." Tr. 62. When she was cashiering, she didn't pay attention "too much" and would "stand[] there" for about ten minutes with people in line, forgetting to "call them up." Tr. 63. That was not from anxiety, but due to Fowler "zon[ing] out." Tr. 63. Fowler's supervisors didn't comment on her behavior—they "really didn't care about anything." Tr. 63.

When asked if she was working with a counselor to gain working skills, Fowler said no. Tr. 63. She sees a counselor once or twice a month. Tr. 64. Her counselor sometimes helps her learn how to deal with anxiety. Tr. 64. Fowler doesn't see a doctor for her anxiety. Tr. 64. She used to, but Covid-19 "messed everything up" and Fowler "just never went back." Tr. 64. She never took anxiety medication. Tr. 64. She tried other mental health medications, but they didn't help. Tr. 64–65.

14

Fowler has two cats, two birds, and a gecko. Tr. 65. But Fowler doesn't care for them other than feeding the birds, which she sometimes needs reminders to do. Tr. 65. Fowler performs personal care tasks, prepares food, and performs household chores except for vacuuming. Tr. 66. It takes her two days to vacuum because she feels overwhelmed. Tr. 66. She can go shopping if someone is with her but becomes anxious if she goes by herself. Tr. 66–67.

When asked how she passes the time, Fowler said that she stares at the wall. Tr. 67. When asked if she plays video games, Fowler said that she used to play every day, all day, and she would play with friends online. Tr. 67–68. But the last few weeks, Fowler wasn't interested anymore in playing video games. Tr. 68. She talks on the phone with her friends or her boyfriend. Tr. 68. She and her boyfriend go on walks or "just sit around." Tr. 68. When asked what she does on a typical day, such as the day before the hearing, Fowler stated that she got up around four o'clock in the afternoon and spoke to a friend from then until about ten o'clock the morning of the hearing. Tr. 69. Fowler and her friend also watched a few videos on YouTube. Tr. 69. Fowler didn't sleep. Tr. 69. Fowler said that she doesn't have any problems concentrating when she plays videogames. Tr. 73.

Fowler was asked about her school records, which showed a lot of school absences. Tr. 69. Fowler agreed that she had so many absences that she "almost didn't pass." Tr. 70. Fowler's mother had to go to court because of

15

Fowler's unexcused school absences. Tr. 70. Then Fowler moved to her dad's house, and her school absences improved. Tr. 70.

Fowler said that she has a bad back from "horrible scoliosis" and a large chest "that is probably making [her back] worse." Tr. 71–72. For years, Fowler has tried to get breast reduction surgery and a back brace. Tr. 72. She can lift any amount of weight but can't stand for more than an hour. Tr. 72.

The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age and education as Fowler could perform any work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 74–76. The vocational expert answered that such an individual could perform the following jobs in the national economy: production laborer, machine cleaner, and hand packer. Tr. 75–76.

### The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant has not engaged in substantial gainful activity since June 27, 2020, the date on which the application was filed (20 CFR 416.971 *et seq.*).
>
> 2.  The claimant has the following severe impairments: Asperger's disorder, macromastia, and obesity (20 CFR 416.920(c)).
>
> 3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

16

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work, as defined in 20 CFR 416.967(c), except with the following additional limitations: She can frequently climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, crouch, or crawl. She must avoid all exposure to workplace hazards such as unprotected heights or moving mechanical parts. She can perform simple, routine tasks but not at a production rate pace (as in assembly-line work). She can interact occasionally with others, but with no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others. She can adapt to occasional changes in the work setting or routine.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born [i]n … 2001 and was 18 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, no work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since July 27,

2020, the date the application was filed (20 CFR 416.920(f)).

Tr. 21–45.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

> 5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

19

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

### 1. *Opinion evidence*

Fowler argues that the ALJ erred when she evaluated the opinion of Rachel Pearson, Fowler's counselor. Doc. 7, at 9. After thoroughly detailing all of the evidence in the record, Tr. 22–41, the ALJ spent over a page explaining why she didn't find persuasive Pearson's opinion. Tr. 41–42. The ALJ first observed that the form Pearson completed, which was provided to her by Fowler's attorney, was skewed towards more severe limitations. Tr. 41 ("the undersigned must state at the outset that the form itself is leading towards ratings of marked to extreme limitations, which carry some impact on overall persuasiveness for responses.").

20

The ALJ continued:

> More critically, Ms. Pearson's opinion that the claimant's impairments render her "unable to meet competitive standards" in maintaining attention and concentration for extended periods and rating of "seriously limited" abilities for performing activities within a schedule, sustaining an ordinary routine without special supervision, and completing a normal workday and workweek without interruptions from psychologically based symptoms are **not persuasive** because they are not supported by any actual objective findings from her counseling sessions with the claimant, despite her vague citation to same, but rather were expressly "based on <u>collaboration with client</u>" at that March 2021 counseling sessions, which imparts that her responses to the form were primarily the claimant's current self-rated limitations and, in turn, not Ms. Pearson's independently formulated medical opinion (Ex. 9F/1 [emphasis added]; *and see* Ex. 12F/5 ["engaged to complete evaluation sheet requested from attorney"]).

Tr. 41. Fowler complains that the ALJ's conclusion that Pearson's findings were based on collaboration with Fowler was "erroneous." Doc. 7, at 9. But Fowler concedes that Pearson wrote that her findings were "based on collaboration" with Fowler. *Id.*; Tr. 564, 854. So the ALJ's conclusion was accurate.

Fowler argues that the ALJ erred when concluding that Pearson's findings were not supported by Pearson's "actual objective findings" from counseling sessions with Fowler. Doc. 7, at 9. But the only "actual objective findings" Fowler cites is that Pearson twice described Fowler as presenting with a "[slightly] anxious affect and expression." *Id.* (citing Tr. 444, 449). That

objective finding doesn't show that Fowler has severe limitations in maintaining attention and concentration, sustaining an ordinary routine, and completing a normal workday and workweek without interruptions from symptoms. Throughout the decision, the ALJ discussed that Pearson "a few" times observed Fowler to be "slightly anxious" during counseling sessions. Tr. 26 (citing Pearson's counseling notes, Tr. 444–45, 449); *see also* Tr. 28, 35, 40. And the ALJ commented that, despite those few "slightly anxious presentations," Pearson didn't refer Fowler for a psychiatric evaluation "for potentially initiating antianxiety or other psychotropic medication(s) as treatment complementary to [Fowler's] ongoing individual counseling sessions." Tr. 35. The ALJ also wrote that Fowler's slightly anxious presentation was temporary and resolved with an improvement in Fowler's living situation. Tr. 35. Fowler doesn't challenge any of those findings.

Moreover, the ALJ went on to explain that *no providers* observed Fowler to have a marked or extreme degree of limitation in maintaining attention and concentration. Tr. 41. And other evidence in the record didn't support such a finding, either—not Fowler's school records, job performance, the reason Fowler ended her job, or Fowler's daily activities, including the fact that Fowler sustained video gaming for up to 24 hours. Tr. 41–42. The ALJ remarked that Pearson didn't mention in her opinion any of her observations at counseling sessions of Fowler. Tr. 42. Pearson also didn't account for the fact that Fowler's mother told Pearson that Fowler used medical transportation by herself,

22

interacted with peers at work "with minimal anxiety," and did well at work. Tr. 42. Finally, the ALJ commented that Pearson didn't answer certain questions on the form and was "'unable to determine' whether or how often [Fowler's] impairments would cause [Fowler] to be absent from work or to be off task from performing job duties." Tr. 42. As a result, the ALJ wrote, even Pearson didn't opine that Fowler's off-task behavior and absenteeism was as severe as Fowler's attorney had alleged at the hearing. Tr. 42. Fowler doesn't challenge any of those findings, either.

Next, Fowler argues that the ALJ erred when she evaluated the state agency reviewers' opinions. Doc. 7, at 12. The ALJ found partially persuasive the state agency reviewers' opinions. Tr. 39–40. The ALJ explained that those reviewers failed to account for Fowler's "moderately limited pace of performance," which the ALJ remedied by including a limitation in the RFC prohibiting Fowler from performing work tasks at a production-rate pace. Tr. 40. The ALJ also clarified some vague terms used by those reviewers. Tr. 40. The ALJ then explained why she found the balance of the state agency reviewers' opinions persuasive:

> because they were thoroughly well supported by summaries and analyses of the available medical evidence from Phoenix Rising, including the relevant clinical observations of predominantly euthymic affect and expression to no more than "slight" anxiety; the educational reports via the 2019 and 2020 ETRs and included comments regarding IEP accommodations but retaining the claimant in the general education environment, teacher concerns about frequent class absences, and high

average range of cognitive abilities per historical WISC-IV test; and even the September 2017 BVR assessment that documents similar notations from earlier ETRs about difficulties that the claimant had in school with staying on task, controlling emotions and impulses, and getting easily distracted (*see* Ex. 2A/2,4; 4A/2,4). Thus, the State agency PCs considered the evidence that was cited by the claimant's attorney during the hearing as offered support for markedly or even extremely limiting effects on the claimant's sustained concentration and persistence, social interactional abilities, and/or adaptation abilities, and the undersigned has found their consideration of such evidence strong support for their ratings of moderately limited mental abilities with residual capacities to meet reduced work demands as identified above, and not consistent with the attorney's argument for greater degree of mental functional limitations.

Tr. 40.

Fowler submits that the ALJ erred because, while she noted the Ohio Bureau of Vocational Rehabilitation's 2017 findings, the ALJ "erroneously failed to include these limitations in [her] RFC." Doc. 7, at 12. But elsewhere in her decision, the ALJ detailed Fowler's school records and the Ohio Bureau of Vocational Rehabilitation findings. Tr. 27, 28, 32–33, 36. The ALJ explained that she gave little evidentiary weight to "this early non-medical evidence from the Ohio [Bureau of Vocational Rehabilitation] based on the lack of pursuit of early attempts to work and any actual engagement in services noted, the 2019 and 2020 educational evidence discussed next, and the longitudinal medical evidence from [Fowler's] counselor." Tr. 32–33. The ALJ relied on the state agency reviewers' evaluation of the vocational evidence over Fowler's

24

attorney's evaluation of that evidence and limited Fowler accordingly. Tr. 40. Fowler doesn't challenge that finding. She only disagrees with it, which is not a basis for reversing the ALJ's decision.

Finally, Fowler asserts that the ALJ "failed to give a coherent explanation for h[er] reasoning as h[er] rationale failed to view the entire record." Doc. 7, at 13. Fowler's argument is belied by the ALJ's decision, which shows that the ALJ's discussion of all the record evidence spanned 20 pages. Tr. 22–42. Fowler doesn't identify any incoherent portion of the decision or evidence she believes the ALJ failed to view. In short, Fowler's assertion that the ALJ erred when evaluating the opinion evidence lacks merit.

### 2. Other arguments

Fowler submits that, "[e]ven though the ALJ did not find all of Fowler's impairments severe, [the ALJ] was to consider all relevant evidence in the case record to determine whether Fowler was disabled …. The ALJ committed harmful error when [s]he failed to consider all her impairments." Doc. 7, at 16. The only "impairment" that Fowler identifies is her "complaints of back pain for which she attended physical therapy." *Id.*

But "complaints" of back pain, alone, do not establish a *medically determinable impairment. See* 20 C.F.R. § 416.929(a). In any event, the ALJ discussed Fowler's reports of back pain and Fowler's physical therapy to improve core strength. Tr. 22–23. The ALJ explained that, while Fowler's "alleged scoliosis in not a medically determinable impairment," the ALJ

considered Fowler's reports of back pain as attributable to Fowler's severe impairments of obesity and macromastia and considered those issues in the balance of her decision. Tr. 23. *See also* Tr. 24, 30–32 (the ALJ explaining why, despite Fowler's severe impairments and her reports of back pain, Fowler was no more limited than the ALJ's RFC assessment), Tr. 37.

Next, Fowler contends that "her psychological impairments caused symptoms which precluded her from engaging in substantial gainful activity on a full-time and sustained basis." Doc. 7, at 16. In support, Fowler cites Social Security Ruling 11-2p, *Documenting and evaluating disability in young adults*, 2011 WL 4055665 (Sept. 12, 2011). *Id*. at 17; Doc. 10, at 2. Fowler complains that the ALJ concluded that, based on Fowler's "short-term part-time work[,] … Fowler would not need a job coach or any extra supports to learn and perform job duties." Doc. 7, at 17 (citing Tr. 37). Fowler argues that the ALJ's conclusion was not supported by substantial evidence, and that evidence "demonstrated contrary conclusions." *Id*. Fowler ignores the ALJ's explanation, covering an entire page, discussing Fowler's experience with work—being assessed for work, looking for work, working, and Fowler's inconsistent reports to various people about why Fowler stopped working—and why, given that history, Fowler could still perform the ALJ's assessed work limitations. Tr. 36–37. The ALJ's explanation cites substantial evidence in support. *Id*. So it must be affirmed. *See Jones*, 336 F.3d at 477 (the

26

Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 19, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).